UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ELI E. GARCIA,<br><br>               Petitioner,<br><br>    v.<br><br>JIM MACDONALD, et al.,<br><br>               Respondents. | Case No.  15-cv-04484-WHO<br><br>**ORDER GRANTING IN PART MOTIONS FOR EVIDENTIARY HEARING AND ORAL ARGUMENT AND DENYING IN PART PETITION FOR HABEAS CORPUS** |

**INTRODUCTION**

Petitioner Eli E. Garcia seeks federal habeas relief from 15 counts of lewd acts upon a child under 14 and 6 counts of contacting or communicating with a minor with the intent to commit a sex offense.  He raises eight potential claims for relief: (1) Juror No. 22 committed misconduct by failing to inform the trial court that she was related to the victim, Jane Doe, and the victim's mother, Stacy Forstell; (2) the prosecutor committed misconduct by highlighting Jane Doe's virginity in closing arguments despite the fact that no evidence was presented to show Doe was a virgin; (3) petitioner's trial counsel was ineffective in failing to object to this prosecutorial misconduct; (4) the trial court erred by sentencing petitioner to consecutive sentences, totaling 17 years; (5) petitioner's trial counsel was ineffective in failing to object to the sentence; (6) the trial court erred in allowing the prosecutor to ask petitioner questions beyond the scope of direct examination in violation of the petitioner's privilege against self-incrimination; (7) the convictions for contacting a minor with an intent to commit sexual offense are not supported by sufficient evidence; and (8) the cumulative errors in petitioner's case warrant relief.  Petitioner also moves for oral argument and an evidentiary hearing.  Dkt. No. 23; Dkt No. 24.

1    For the reasons stated below, I DENY relief on claims (2)-(8).  The California Court of

2    Appeal correctly addressed those issues and, importantly, the weight of the evidence against

3    petitioner, including his own admissions, is overwhelming.  However, there are potential issues

4    concerning the dishonesty of Juror No. 22's answers in voir dire and failure to disclose her family

5    relationship to the victim and mother of the victim in this case, and whether to impute bias.  If

6    established, such a constitutional violation goes to the heart of petitioner's right to an impartial

7    jury and a fair trial.  I GRANT petitioner's request for an evidentiary hearing on claim (1)

8    regarding potential juror bias.

9    **BACKGROUND**

10    Petitioner is a California state prisoner serving a sentence of 17 years.  A jury found him

11    guilty of 15 counts of lewd acts upon a child under the age of 14, under Cal. Penal Code § 288(a)

12    and six counts of contacting or communicating with a minor with the intent to commit a sex

13    offense under Cal. Penal Code § 288.3(a).  On direct appeal to the California Court of Appeal,

14    petitioner raised Claims (2)-(8) as grounds for relief.  The California Court of Appeal affirmed the

15    conviction, *People v. Garcia*, No. H039212, 2014 WL 3752799 (Cal. App. July 31, 2014) (Pet.

16    Ex. 1),  (Dkt. No. 1-1), and on October 15, 2014 the California Supreme Court denied review.

17    *People v. Garcia*, No. S221105 (Cal. Oct. 15, 2014) (en banc) (Pet. Ex. 4), (Dkt. No. 1-1).

18    While his direct appeal was pending, petitioner filed for habeas relief in the California

19    Court of Appeal, raising Claims (1), (3), (5), and (8).  The petition was denied on July 31, 2014.

20    *In re Garcia*, No. H040599 (Cal. App. July 31, 2014) (Pet. Ex. 2), (Dkt. No. 1-1).

21    Petitioner filed a petition for habeas corpus with the California Supreme Court on

22    September 29, 2014, raising Claim (1) as grounds for relief.  The California Supreme Court denied

23    the petition on December 17, 2014, stating only "The petition for writ of habeas corpus is denied"

24    and citing *People v. Duvall* (1995) 9 Cal.4th 464, 474; and *In re Dixon* (1953) 41 Cal.2d 756, 759.

25    *In re Garcia*, No. S221537 (Cal. Dec. 17, 2014) (en banc) (Pet. Ex. 5), (Dkt. No. 1-1).

26    The California Court of Appeal summarized the facts of this case in its July 31, 2014

27    unpublished opinion:

28    In October of 2011, 12–year–old Jane Doe met 18–year–old

2

United States District Court
Northern District of California

defendant at her friend's birthday party, which was held in a park in Seaside. They began texting each other and soon began a dating relationship that included kissing and sexual intercourse. Doe, who lived with her grandparents, would initially sneak out of her house to see defendant. Later in the relationship, defendant would sneak into Doe's bedroom to see her.

### A. Late November 2011 (Counts 1–3)

Before Thanksgiving in 2011, Doe snuck out of her house to meet up with defendant. She drove her grandmother's van to a market where defendant was waiting for her. Doe and defendant then drove around together. Nothing physical happened.

One or two weeks later, after Thanksgiving, Doe and defendant texted to make arrangements to meet again. They also texted about what they would do physically, which included Doe giving defendant "blow jobs and stuff." Doe again took her grandmother's van and drove around with defendant. They stopped and "got physical." They touched each other and kissed, then took their clothes off and had sexual intercourse. Sometime afterwards, Doe told defendant that she was 12 years old.

Based on the above, defendant was charged with one count of contacting or communicating with a minor with the intent to commit a sex offense (count 1; § 288.3, subd. (a)) and two counts of committing a lewd act on a child under the age of 14 (counts 2 & 3; § 288, subd. (a)). Count 2 was based on the kissing; count 3 was based on the sexual intercourse. A substantial sexual conduct allegation was attached to count 3. (§ 1203.066, subd. (a)(8).)

### B. Mid–December 2011 (Counts 4 & 5)

In the middle of December 2011, Doe and defendant got together again after exchanging text messages. They walked together, held hands, and kissed.

Based on the above, defendant was charged with one count of contacting or communicating with a minor with the intent to commit a sex offense (count 4; § 288.3, subd. (a)) and one count of committing a lewd act on a child under the age of 14 (count 5; § 288, subd. (a)).

### C. Before Christmas 2011 (Counts 6 & 7)

Right before Christmas of 2011, Doe and defendant met up again after making arrangements via text messages. They went to defendant's friend's house, where they stayed overnight. Doe and defendant kissed while in the car.

Based on the above, defendant was charged with one count of contacting or communicating with a minor with the intent to commit a sex offense (count 6; § 288.3, subd. (a)) and one count of committing a lewd act on a child under the age of 14 (count 7; § 288, subd. (a)).

### D. After Christmas 2011 (Counts 8–10)

After Christmas of 2011, Doe called defendant and made arrangements to meet up with him. They drove to the beach in

3

defendant's friend's car. They kissed and had sexual intercourse in the car.

Based on the above, defendant was charged with one count of contacting or communicating with a minor with the intent to commit a sex offense (count 8; § 288.3, subd. (a)) and two counts of committing a lewd act on a child under the age of 14 (counts 9 & 10; § 288, subd. (a)). Count 9 was based on the kissing; count 10 was based on the sexual intercourse. A substantial sexual conduct allegation was attached to count 10. (§ 1203.066, subd. (a)(8).)

### E. November 20, 2011 Through January 20, 2012 (Counts 11–21)
Following the incident after Christmas, Doe and defendant saw each other on a daily basis. Defendant would sneak into Doe's bedroom through a window. Doe would call defendant from school to find out if he was coming over. They always kissed when defendant came over, and they had sex on three or four different occasions. Doe took photographs of defendant kissing her and of defendant's hand on her breast.

Based on the above, defendant was charged with four counts of contacting or communicating with a minor with the intent to commit a sex offense (counts 11, 14, 17, & 21; § 288.3, subd. (a)) and seven counts of committing a lewd act on a child under the age of 14 (counts 12, 13, 15, 16, 18–20; § 288, subd. (a)). Counts 12 and 13 were based on the first time Doe and defendant kissed and had sex in the bedroom. Counts 15 and 16 were based on the second time Doe and defendant kissed and had sex in the bedroom. Counts 18 and 19 were based on the third time Doe and defendant kissed and had sex in the bedroom. Count 20 was based on defendant touching Doe's breast. Substantial sexual conduct allegations were attached to counts 13, 16, and 19. (§ 1203.066, subd. (a)(8).)

### F. Los Angeles (Counts 22 & 23)
In January of 2012, Doe's grandmother found a photograph of Doe and defendant. Doe's grandmother said she was going to send Doe away to a boarding school. Doe was taken to the police station. She informed defendant that the police were looking for him. Defendant said he planned to go to Los Angeles. Doe asked defendant to take her with him. Defendant agreed, then said no, because he did not want to get into trouble. Doe then said, "[I]f you love me you'll take me." She called him from school and arranged to meet him. Some of defendant's friends then drove them both to an apartment in Los Angeles.

The day that they arrived in Los Angeles, Doe and defendant had sexual intercourse. Defendant also orally copulated Doe. After they went to sleep that night, defendant's uncle woke them up and handed them a phone. Doe spoke to a police officer and her mother. At about 2:00 a.m., police broke down the apartment door.

Based on the above, defendant was charged with two counts of committing a lewd act on a child under the age of 14 (counts 22 & 23; § 288, subd. (a)). Substantial sexual conduct allegations were attached to both counts. (§ 1203.066, subd. (a)(8).)

4

### G. Defendant's Interview and Testimony

Defendant was interviewed by the police after the Los Angeles incident. He acknowledged being in a dating relationship with Doe. He claimed he had engaged in sexual intercourse with Doe only three times, beginning 30 days earlier. He denied orally copulating her and denied having sex with her in Los Angeles. He admitted Doe told him she was 12 years old. Doe told him she had sex with someone else before him.

At trial, defendant admitted meeting Doe in October 2011 and texting with her afterwards. He admitted continuing to see Doe after finding out that she was 12 years old, but he claimed he did not find out her true age until after they had sex "a couple of times." Defendant admitting sneaking into Doe's house, going to Los Angeles with Doe, and having sex with her in Los Angeles. Defendant testified that he and Doe "love each other very much" and that their relationship was about more than just sex. He claimed he did not want to have sex with Doe after finding out her true age. He admitted telling "some lies" during his police interview.

### H. Verdicts and Sentencing

The jury found defendant not guilty of two counts of contacting or communicating with a minor with the intent to commit a sex offense (counts 1 & 21; § 288.3, subd. (a)), but it found him guilty of all the other counts. The jury found true all seven substantial sexual conduct allegations. (§ 1203.066, subd. (a)(8).) The trial court sentenced defendant to a 17–year prison term.

*Garcia*, 2014 WL 3752799, at *1–3.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."

5

*Williams (Terry) v. Taylor,* 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

Here, petitioner has raised claims in this federal habeas petitioner that were raised on direct appeal and in his state habeas petition. In its unpublished opinion of July 31, 2014, the California Court of Appeal addressed petitioner's Claims (2)-(8). The California Supreme Court denied review on appeal. The California Court of Appeal was the last court to present a reasoned decision on these claims and I review its decision here. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

Petitioner raised his Claim (1) in habeas petitions before the California Court of Appeal and the California Supreme Court. His claim was summarily denied by both courts. Pet. Exs. 2, 5; Dkt. No. 1-1. When a federal court is presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine "whether the state court's decision is objectively reasonable." *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). The applicable standard of review for petitioner's juror misconduct claim is independent review of the record, which "is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2000). "[W]here a state court's decision is unaccompanied by an explanation the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *See Harrington v. Richter*, 562 U.S. 86, 101 (2011).

**DISCUSSION**

**I.   CLAIM 1: BIAS ON THE PART OF JUROR NO. 22**

Petitioner argues that Juror No. 22 was actually or impliedly biased, violating his rights to an impartial jury, due process, and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, because she failed to disclose her relationship to the victim and the victim's mother.  Pet. 13. Juror No. 22 is related to several key individuals and witnesses in this case, including the victim Jane Doe (also referred to by her first name Kayli, during the trial), the victim's mother, Stacy Forstell, and the victim's grandmother, Sandy Castaldo.  Although Juror No. 22 indicated that Sandy Castaldo was her cousin during the voir dire process, she did not indicate any relationship to Stacy Forstell or the victim.  Petitioner asserts that this omission was misleading and dishonest and undermined the impartiality of the jury.  Pet. 12-13.

**A.   Factual Background Regarding Juror No. 22**

During voir dire, the presiding judge listed potential witnesses in the case, including Doe, Forstell, and Castaldo.  Augmented Reporter's Transcript ("ART") at 29 (Dkt. No. 15-4).  The court then asked if any potential jurors were familiar with the names of the potential witnesses.  *Id.* Juror No. 22 volunteered that she was related to Castaldo:

> THE COURT: Anyone recognize any of the persons involved in this case? Juror No. 22?
>
> PROSPECTIVE JUROR NO. 22: I heard you say the name Sandy Castaldo.
>
> THE COURT: Yes.
>
> PROSPECTIVE JUROR NO. 22: That's my cousin.
>
> THE COURT: Again, do you see her a lot?
>
> PROSPECTIVE JUROR NO. 22: No, I do not.
>
> THE COURT: When is the last time you saw her?
>
> PROSPECTIVE JUROR NO. 22: I saw her at the bank, and I'm going to say three months ago. She's married to my cousin Sal.
>
> THE COURT: I don't know the nature of her testimony. And there are witnesses who may or may not be at the scene of an alleged incident. There are other witnesses who take statements. There are

United States District Court
Northern District of California

7

1    other witnesses who are quite peripheral. I have no idea where she
     falls on that continuum. I'll let the attorneys ask you some questions.

2
     Let's assume, for the sake of argument, she came in and she
3    testified. Would you evaluate her testimony by the same standards
     you would any other witness?

4    PROSPECTIVE JUROR NO. 22: Yes. Yes, I would.

5    THE COURT: Do you think you would believe anything she said
     just because she's your cousin?
6
     PROSPECTIVE JUROR NO. 22: No, I'm not well, I'm not that
7    close to her. I mean, I just thought I should let you know I'm related.

8    THE COURT: We do need to know you're related. It's very
     important.
9

10   ART 76-77.

11        Although Castaldo, Doe, and Forstell are all related–Castaldo is Doe's grandmother and at

12   the time was her guardian, and Forstell is Doe's mother–Juror No. 22 only volunteered that she

13   knew Castaldo.

14        In his petition for state habeas relief, which petitioner incorporates by reference in his

15   federal petition, petitioner submitted declarations from Stacy Forstell and Juror No. 22.  In her

16   declaration Juror No. 22 elaborates on her relationship to the case participants and explains why

17   she failed to disclose more information during voir dire:

18        1.  I served as a juror in the trial of People v. Eli Garcia, Monterey
          County Case No. SS120091A.  I was Juror No. 22.
19
          2.  Salvador Castaldo is my cousin. Sandy Castaldo is married to
20        Salvador. Stacey Castaldo nee Forstell is Mr. Castaldo's daughter by a
          prior marriage. Kayli is Stacey's daughter.
21
          3.  During voir dire, I identified Sandy Castaldo as my cousin. I
22        anticipated that I would be dismissed from serving when I disclosed my
          relation to Sandy. I was not trying to get out of jury service. However, I
23        expected that my relation to a witness would automatically disqualify me
          from service in the case.
24
          4.  I expected that the Court or the attorneys would ask me about my
25        relation with Stacey Forstell. I was never asked about my relation to
          Stacey. If asked, I would have disclosed that I was related to Stacey.
26
          5.  I did not recognize the name Kayli, Stacey's daughter. Kayli was
27        the victim in the case.
28

8

1

      6.  Kayli and Sandy testified during the trial.

2

Declaration of [Juror No. 22] (Dkt. No. 15-6, p 111-112).

3

      Stacy Forstell further outlines Juror No. 22's relationship to the case participants in her

4

declaration:

5

      1. I am Kayli's mother. I am thirty (30) years old. My maiden name is
Stacey Castaldo. I married and took my current name in 2008.

6

7

      2. My father is Salvatore "Sal" Castaldo.

8

      3. Sal has three sisters. One of those sisters is Anne Jay. Anne Jay is
very close with her and Sal's cousin, [Juror No. 22]. Anne and [Juror No.
22] have been close since I was a child.

9

10

      4. When I was a child, Anne and [Juror No. 22] operated the Grand
Deli in Pacific Grove, California. I spent a substantial amount of time with
Anne and [Juror No. 22] at Grand Deli before the age of fourteen. I also
spent time at [Juror No. 22's] house and saw [Juror No. 22] at various
family functions.

11

12

13

      5. When I was twelve years old, my mother and father divorced. When
I was fourteen, my father married his current wife, Sandy Castaldo. There
was a significant amount of turmoil in my family at that time, and I had
much less interaction with many of my relatives.

14

15

16

      6. I have not had substantial interaction with [Juror No. 22] since my
father remarried. I am friends with [Juror No. 22] on Facebook and was
friends with her before October 2012. In October 2012, my username on
Facebook was "Stacey Forstell."

17

18

      7. I became pregnant with Kayli and gave birth to her when I was
fourteen years old. When Kayli was less than one year old, I was unable to
take custody of her, and Sal and Sandy assumed responsibility of Kayli.

19

20

      8. Sal and Sandy retained custody of Kayli throughout her childhood.

21

      9. I am informed and believe that when Kayli was a child she met and
spent time with [Juror No. 22] when she visited her aunt Anne.

22

23

      10. In January 2011, Kayli and Eli Garcia went to Los Angeles. Mr.
Garcia was arrested in Los Angeles. I traveled to Los Angeles to meet
Kayli. Kayli lived with me immediately after she returned from Los
Angeles and I have since gained legal custody of Kayli.

24

25

      11. Prior to the trial of Eli Garcia, I had several conversations with the
prosecutor in this case, Mr. Breeden. I also met on several occasions with
the Victim Witness Advocate that had been assigned to Kayli. Her first
name was Elma.

26

27

      12. Mr. Breeden subpoenaed me to appear as a witness in the trial of
Mr. Garcia.

28

13. On October 23, 2012, I went to the Monterey County Superior Court for Mr. Garcia's trial. Initially, Sandy and I were asked to wait in a separate room from all other potential witnesses. When Sandy entered the courtroom to testify, I waited in the courtroom hallway. When Sandy exited the courtroom, she was crying and exclaimed: "Your f**king cousin is on the jury!" She explained that she was referring to [Juror No. 22].

14. Immediately after I learned that [Juror No. 22] was on the jury, I informed the Victim Witness Advocate, Elma about our family's relation to [Juror No. 22]. The court was on break at this time. Elma informed me that she would tell Mr. Breeden, and she entered the courtroom. Elma exited the courtroom and told me that she had informed Mr. Breeden and that Mr. Breeden said that I was excused from the subpoena and would not be testifying. Kayli and I went to the victim's compensation office. I did not enter the courtroom.

Declaration of Stacy Forstell (Forstell Decl.) (Pet. Ex. 1), (Dkt. No. 1-1).

**B.   Juror Bias**

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. CONST. AMEND. VI.  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.3d 520, 523-24 (9th Cir. 1990) (internal quotation marks omitted).  The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982):

"The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.  Such determinations may properly be made at a hearing."

*Id.*

The Ninth Circuit has identified three theories of juror bias: "*McDonough*-style bias, which turns on the truthfulness of a juror's responses on voir dire; actual bias, which stems from a pre-set disposition not to decide an issue impartially; and implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." *Fields v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007) (en banc) ("*Fields II*").

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1. *McDonough*-style Bias

Under *McDonough*, a petitioner may be entitled to a new trial on the basis of a juror's false response, but "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). "[A]n honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). Courts cannot expect perfection from jurors and "must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment." *Id.* In assessing petitioner's *McDonough* claim, I must determine whether Juror No. 22's answers were dishonest, and, if so, whether this undermined the impartiality of petitioner's jury.

Respondent argues that Juror No. 22 did not act dishonestly by failing to disclose her relation to Forstell and Doe. Answer 9. Respondent contends that Juror No. 22 acted reasonably and honestly in assuming that disclosing her relation to Castaldo was sufficient to reveal her relation to Forstell and was not dishonest in failing to identify her relation to Doe, because she simply failed to recognize Doe's first name. *Id.*; *see* Juror No. 22 Decl. ("I did not recognize the name of Kayli, Stacey's daughter."). Respondent contends that to insist that a "prospective juror delineate each relationship to each witness 'is to insist on something closer to perfection than our judicial system can be expected to give.'" Answer 9 (citing *McDonough*, 464 U.S. at 555).

While it is possible that Juror No. 22's omission was an innocent mistake, there are also reasons to question her explanations. Juror No. 22 declares that she "expected that the Court or the attorneys would ask me about my relation with Stacey Forstell" but she didn't disclose this information because "I was never asked." Juror No. 22 Decl. However, the court repeatedly asked the jurors, as a group, whether they knew any of the proposed witnesses, including Stacey Forstell, and Juror No. 22 failed to disclose this information. Further, when Stacey disclosed her relation to Castaldo, the presiding judge remarked, "We do need to know you're related. It's very

United States District Court
Northern District of California

important."  Despite the court's requests that the jurors reveal if they knew any of the proposed witnesses, and its explanation that it was "very important" for the court to know if the jurors were related to any witnesses, Juror No. 22 did not volunteer that she knew and was related to Stacey Forstell.

There are also reasons to question Juror No. 22's explanation for her failure to reveal her relation to the victim, Doe.  Juror No. 22 declares that she did not disclose her relation to Doe because she did not recognize her first name and did not realize she was Stacey Forstell's daughter.  However, there are several reasons to believe Juror No. 22 would have realized who Doe was.  During the voir dire process, another prospective juror, Juror No. 35, explained to the court that she was friends with Castaldo and knew Doe because Doe was Castaldo's granddaughter.  ART 108.  It seems likely that Juror No. 22 would have been able to piece together Doe's relationship to Stacey given this explanation.  Juror No. 35 also explained that she was aware of the general circumstances of the case because "[i]t was all over social media.  We're in a small community."  Stacy Forstell notes in her declaration that she had been friends with Juror No. 22 on Facebook before the trial began, suggesting that Juror No. 22 also would have been exposed to general details about the case from social media.

Finally, Juror No. 22's failure to inform the court that she recognized Doe once the trial began suggests that her failure to disclose her relation to Doe was not an innocent mistake.  During voir dire, the court informed the prospective jurors that if they recognized any witnesses during trial they should immediately inform the court.  ART 35 ("If someone comes in and testifies during the trial and you recognize the person, you need to let my bailiff know, and we can take it up then.").  Although Doe eventually testified at trial, nothing in the record suggests that Juror No. 22 told anyone that she knew and recognized Doe.  If Juror No. 22 had simply been mistaken in failing to recognize Doe's name during voir dire, it seems likely she would have attempted to rectify the mistake once seeing Doe in person and realizing she was the victim in the case.  Her failure to do so lends credence to a finding of dishonesty, rather than of innocent mistake.

Although none of these issues is conclusive, I am confronted with a record that raises

12

enough suspicions of juror dishonesty to warrant further exploration of bias.

### 2. Implied Bias

In the alternative, petitioner argues that, even if Juror No. 22 answered questions honestly, this court should impute bias because her relation to Forstell and Doe is an extreme circumstance that warrants a presumption of bias. Pet. 14. The Supreme Court has never explicitly adopted the doctrine of implied bias. *Hedlund v. Ryan*, 815 F.3d 1233, 1248 (9th Cir. 2016); *Fields I*, 309 F.3d at 1104. However, in a concurring opinion in *Phillips*, Justice O'Connor explained that a finding of implied bias may be warranted "in appropriate circumstances." 455 U.S. at 221 (O'Connor, J., concurring). As Justice O'Connor explained, "in most instances a postconviction hearing will be adequate to determine whether a juror is biased." *Id.* at 222. However, she noted that "while each case must turn on its own facts, there are some extreme situations that would justify a finding of implied bias," including, for example, "a revelation that a juror is an actual employee of the prosecuting agency" or "that the juror is a close relative of one of the participants in the trial or the criminal transaction . . . ." *Id.*

The Ninth Circuit has similarly recognized that in "extraordinary cases, courts may presume bias based on the circumstances." *Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008) (citing *Dyer*, 151 F.3d at 981) (internal quotation marks omitted). In *Estrada* the court offered examples of potential facts that would justify a finding of implied bias:

> (1) where the juror is apprised of such prejudicial information about the defendant that the court deems it highly unlikely that he can exercise independent judgment even if the juror states he will, (2) the existence of certain relationships between the juror and the defendant, (3) where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern, and (4) where it is revealed that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or that the juror was a witness or somehow involved in the underlying transaction.

*Estrada*, 512 F.3d at 1240 (citing *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1062 (1997)).

Here, Juror No. 22 was related to several key participants in the case: the victim, the victim's mother, and the victim's grandmother and guardian. While I acknowledge that "there are no perfect trials," *McDonough*, 464 U.S. at 553, I am skeptical of the impartiality of a juror who is

related to three witnesses in a criminal case, including the child victim. The unusual and "extreme" facts in this case may warrant a finding of implied bias. *Phillips*, 455 U.S. at 222 (O'Connor, J., concurring).

Respondent asserts that petitioner's claim of implied bias must fail because there is no clearly established federal law outlining the doctrine of implied bias. Answer 9. "It is admittedly often difficult to determine when a case announces a new rule . . . . In general, . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague v. Lane*, 489 U.S. 288, 301 (1989). There are no Supreme Court or Ninth Circuit cases directly on point. However, the Ninth Circuit has held that "we do not require the existence of a case for *Teague* purposes involving identical facts, circumstances, and legal issues." *Fields II*, 503 F. 3d at 772. In *Fields II*, the Ninth Circuit noted that given the Ninth Circuit precedent and Judge O'Conner's concurrence in *Phillips,* "it is difficult to conclude that . . . presuming bias despite an honest disclosure of a potentially disqualifying relationship would have been a new rule of constitutional law in 1984." What would not have been a new rule of constitutional law in 1984 is certainly not new today.

Imputing bias to a juror who is a close relative of the victim, the victim's mother, and the victim's grandmother is not likely a "new" rule. However, the Supreme Court has discouraged the use of "formal categorization" in assessing juror bias. *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990). Instead, it has emphasized the importance of assessing actual bias through voir dire or a post-trial hearing. *McDonough*, 464 U.S. at 556. Before determining whether petitioner is entitled to relief on the basis of implied bias, petitioner should be given an opportunity to assess Juror No. 22's potential actual bias through a post-trial hearing.

## C. Request for Evidentiary hearing

When petitioner became aware of potential juror bias, he requested an evidentiary hearing in both the California Court of Appeal and the California Supreme Court, but his request was denied. As the state courts gave no reasoned opinion for denying petitioner's habeas petitions I look at the record independently.

The law does not require state or federal courts to hold a hearing every time a claim of

United States District Court
Northern District of California

1   juror bias is raised by the parties. *Tracey v. Palmateer*, 341 F.3d 1037, 1045 (9th Cir. 2003).

2   However, a court confronted with a colorable claim of juror bias will generally conduct a hearing

3   involving all interested parties to explore the issue and provide the defendant an opportunity to

4   prove actual bias. *See Hedlund*, 815 F.3d at 1247. A court assessing whether an evidentiary

5   hearing is appropriate should consider the content of the allegations, the seriousness of the alleged

6   misconduct or bias, and the credibility of the source. *See United States v. Angulo*, 4 F.3d 843, 847

7   (9th Cir. 1993). Under Ninth Circuit precedent, a hearing is required if there is a "reasonable

8   possibility" of bias. *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003).

9       Petitioner has raised a colorable claim of actual bias. Consequently, petitioner should be

10   given the opportunity to explore whether Juror No. 22's answers at voir dire were dishonest and

11   whether this undermined the impartiality of petitioner's jury. *See Williams v. Taylor,* 529 U.S.

12   420 (2000) (evidentiary hearing to determine partiality required where one of juror's responses to

13   voir dire query was not forthcoming and another was factually misleading).

14   **D. Ineffective Assistance of Counsel**

15       Petitioner also asserts that his trial counsel, Joy L. McMurty, was ineffective because she

16   failed to inquire into Juror No. 22's relation to Castaldo, Forstell, and Doe. Pet. 15. To succeed

17   on a claim of ineffective assistance of counsel, a petitioner must show (1) that the attorney's errors

18   were so deficient that the petitioner was effectively denied the assistance of counsel and (2) that

19   the errors were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient

20   performance requires a showing that counsel's representation fell below an objective standard of

21   reasonableness as measured by prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510,

22   521 (2003). To establish prejudice, the petitioner "must show that there is a reasonable probability

23   that, but for counsel's unprofessional errors, the result of the proceeding would have been

24   different." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks omitted).

25       There is "a strong presumption that counsel's representation was within the wide range of

26   reasonable professional assistance." *Harrington*, 562 U.S. at 104 (internal quotation marks

27   omitted). A petitioner "must overcome the presumption that, under the circumstances, the

28   challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal

United States District Court
Northern District of California

quotation marks omitted).  Despite this strong presumption, petitioner will likely be able establish that his trial counsel's failure to inquire into Juror No. 22's relationship to Castaldo, Forstell, and Doe fell below an objective standard of reasonableness.  It is hard to imagine how failing to inquire about a juror's relationship to three potential witnesses in a case, including a child victim, would be part of any legitimate trial strategy for a defendant.  There are strong reasons to presume that Juror No. 22's personal connection to the victim, her mother, and her grandmother would have made it difficult for her to be completely impartial.  And there is no plausible reason to keep a juror who is potentially biased against your client on the panel.  Petitioner would likely be able to meet the first prong of *Strickland*.

However, it does not appear that petitioner can establish the second prong of *Strickland*, that counsel's errors resulted in prejudice.  To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks omitted).  Petitioner does not attempt to argue that the results of the proceeding would have been different absent counsel's error.  The evidence supporting petitioner's convictions was overwhelming.  Petitioner himself testified at trial and admitted to many of the charges against him.  There is no reason to believe the outcome of petitioner's trial would have been different had trial counsel questioned Juror No. 22 about potential bias.  Petitioner cannot establish the second prong of *Strickland* and his ineffective assistance of counsel claim fails.

## II.   CLAIM 2: PROSECUTORIAL MISCONDUCT BY ARGUING JANE DOE'S VIRGINITY

Petitioner asserts the prosecutor committed misconduct by arguing that Doe's first sexual encounter was with petitioner, violating his rights under the Sixth Amendment.  Pet. 15.  During closing arguments, the prosecutor highlighted Doe's virginity as follows:

> His acts as far as what he did with [Doe] are reprehensible.
> The fact that he was aware that she was young. The fact that he was aware that she was living with her parents. The fact that she [sic] encouraged her to drive her grandmother's vehicle at substantial risk to her own safety, her own life. The fact that he kept her out all night a number of times when she's in school. The fact that her *first sexual experiences* are with this 18–year–old man. This is something that will stay with her forever. That's why these crimes are so

1            horrific is because you never have another first time. This is part of [Doe's] sexual history for the rest of her life."

2 Reporter's Transcript ("RT") at 190 (Dkt. No. 15-3) (emphasis added).

3       Petitioner argues that the prosecutor's statements about Doe's virginity were improper

4 because there was no evidence in the record to support the idea that Doe's first sexual experience

5 was with petitioner. Petitioner made the same claim on direct appeal in the state appellate court,

6 which rejected his claim.

7       A petitioner may be entitled to reversal on the basis of prosecutorial misconduct if (1) the

8 prosecutor made statements that were improper, and (2) if those statements rendered the trial

9 fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Phillips*, 455 U.S. at 219

10 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

11 fairness of the trial, not the culpability of the prosecutor"). A prosecutorial misconduct claim is

12 decided "on the merits, examining the entire proceedings to determine whether the prosecutor's

13 remarks so infected the trial with unfairness as to make the resulting conviction a denial of due

14 process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks omitted);

15 *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the

16 misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

17       There are several factors courts take into account in assessing whether prosecutorial

18 misconduct results in a due process violation: (1) whether the trial court issued a curative

19 instruction, *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); (2) the weight of evidence of guilt,

20 *compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of

21 guilt) *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury

22 and lack of curative instruction, new trial required after prosecutor's improper reference to

23 defendant's courtroom demeanor); (3) whether the misconduct was isolated or part of an ongoing

24 pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (4) whether the misconduct relates

25 to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to

26 disclose information showing potential bias of witness was critical where prosecution's case rested

27 on credibility of that witness); and (5) whether a prosecutor's comment misstates or manipulates

28 the evidence, *see Darden*, 477 U.S. at 182.

United States District Court
Northern District of California

1    When a curative instruction is issued, a court presumes that the jury has disregarded

2   inadmissible evidence and that no due process violation occurred. *See Greer v. Miller*, 483 U.S.

3   756, 766 n.8 (1987); *Darden*, 477 U.S. at 182 (concluding that inflammatory statements from the

4   prosecutor did not render the trial fundamentally unfair, in part because the trial judge "instructed

5   the jurors several times that their decision was to be made on the basis of the evidence alone, and

6   that the arguments of counsel were not evidence"); *Trillo*, 769 F.3d at 1000 ("We presume that

7   juries listen to and follow curative instructions from judges.").  This presumption may be

8   overcome if there is an "overwhelming probability" that the jury would be unable to disregard

9   evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the

10   defendant.  *See Greer*, 483 U.S. at 766 n.8.

11    The California Court of Appeal found that the trial court issued sufficient curative

12   instructions to correct for any misstatements on the part of the prosecution:

> First, the jury was instructed that the attorney's statements were not
> evidence and that it should decide the case based only on the
> evidence presented at trial. At the beginning of trial, the jury was
> instructed, "You must decide what the facts are in this case. You
> must use only the evidence that is presented in the courtroom.
> Evidence is the sworn testimony of witnesses, the exhibits admitted
> into evidence and anything else I tell you to consider as evidence.
> [¶] ... [¶] Nothing that the attorneys say is evidence." (See
> CALCRIM No. 104.) At the end of trial, the jury was instructed,
> "You must decide what the facts are. It is up to all of you and you
> alone to decide what happened based only on the evidence that has
> been presented to you in this trial." (See CALCRIM No. 200.) The
> jury was also instructed, "Nothing that the attorneys say is
> evidence." (See CALCRIM No. 222.) "In the absence of evidence to
> the contrary, we presume the jury understood and followed the
> court's instructions" and did not base its verdicts on any
> misstatement by the prosecutor. (*People v. Williams* (2009) 170
> Cal.App.4th 587, 635.)

23   *Garcia*, 2014 WL 3752799, at *8.  I concur with the Court of Appeal's analysis that the trial

24   court's instructions were sufficient to cure any misstatements.

25    Evaluation of the remaining factors explains why.  In assessing the additional factors the

26   state court reasoned as follows:

27
> [A]ny misstatement by the prosecutor did not bear directly on the
> issue of whether defendant committed the charged offenses, and the
28
> evidence of the charged offenses was overwhelming. Doe testified

18

> that she engaged in consensual sexual intercourse with defendant as
> well as other acts such as kissing and holding hands. Defendant
> admitted having sexual intercourse with Doe and being in a
> romantic relationship with her despite her age. Doe testified that she
> and defendant would meet up after communicating by text message
> or phone calls, and defendant acknowledged exchanging text
> messages with her.

*Garcia*, 2014 WL 3752799, at *8–9.

As the Court of Appeal found, the weight of the evidence in this case was overwhelming and the prosecutor's statement about Doe's virginity was irrelevant to the elements of the charges. In addition, the prosecutor's statement appears to have been an isolated incident and was not part of a pattern of improper statements. Given the curative instruction issued by the trial court, the overwhelming evidence against petitioner, the irrelevance of the statement about Doe's virginity, and the fact that the statement was an isolated incident, the prosecutorial misconduct alleged does not rise to the level of a due process violation. The Court of Appeal's denial of petitioner's claim was reasonable and is therefore entitled to AEDPA deference. Petitioner's request for relief on Claim 2 is DENIED.

## III. CLAIM 3: INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO OBJECT TO PROSECUTORIAL MISCONDUCT

Petitioner argues that his trial counsel provided ineffective assistance because she failed to object to the prosecutorial misconduct alleged in Claim 2. Pet. 17. To succeed on a claim of ineffective assistance of counsel, a petitioner must show (1) that the attorney's errors were so deficient that the petitioner was effectively denied the assistance of counsel and (2) that the errors were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The standards created by *Strickland* and [AEDPA] are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105. In considering an ineffective assistance of counsel claim from a state prisoner, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.*

Petitioner raised this same claim on appeal to the California Court of Appeal. The state court denied petitioner's claim, reasoning:

> Whether we address defendant's prosecutorial misconduct claim
> directly or through the prism of his claim of ineffective assistance of
> counsel, reversal is not required. Even if the prosecutor committed

19

United States District Court
Northern District of California

1

2

3

misconduct and even if trial counsel should have objected, defendant has not demonstrated prejudice. He has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, supra, 466 U.S. at p. 694; see People v. Milner (1988) 45 Cal.3d 227, 245 (Milner).

4

. . .

5

6

7

8

9

10

11

12

13

[A]ny misstatement by the prosecutor did not bear directly on the issue of whether defendant committed the charged offenses, and the evidence of the charged offenses was overwhelming. Doe testified that she engaged in consensual sexual intercourse with defendant as well as other acts such as kissing and holding hands. Defendant admitted having sexual intercourse with Doe and being in a romantic relationship with her despite her age. Doe testified that she and defendant would meet up after communicating by text message or phone calls, and defendant acknowledged exchanging text messages with her. On this record, there is no reasonable probability that "the result of the proceeding would have been different" if trial counsel had objected to the prosecutor's statement about Doe's lack of prior sexual experience. (See Strickland, supra, 466 U.S. at p. 694.) Likewise, it is not " 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant.' " (See Milner, supra, 45 Cal.3d at p. 245.)

14

Garcia, 2014 WL 3752799, at *8–9.

15

16

17

18

As petitioner has not shown any prejudice to his proceeding, the Court of Appeal's denial of petitioner's claim was not an objectively unreasonable application of Strickland. Petitioner's Claim 3 is DENIED.

19

## IV. TRIAL COURT ERRED IN SENTENCING PETITIONER TO SEVENTEEN YEARS IN PRISON

20

21

22

23

24

25

26

Petitioner argues that the trial court made numerous errors at sentencing because it: (1) failed to articulate its reasons for imposing consecutive sentences, as required by California law; (2) improperly considering the victim's age as a sentencing factor; (3) failed to impose an individualized sentence; (4) failed to find certain factors in mitigation; (5) and erroneously imposed the middle term instead of the low term on several counts. Pet. 19-24. Petitioner asserts, without explanation, that these alleged errors violated his Eighth and Fourteenth Amendment rights.

27

28

State courts must be accorded wide discretion in making sentencing decisions. See Walker v. Endell, 850 F.2d 470,476 (9th Cir. 1987), cert denied, 488 U.S. 926, and cert. denied, 488 U.S.

981 (1988).   Federal courts must defer to the state courts' interpretation of state sentencing laws.
*See Bueno v. Hallahan*, 988 F.2d 86, 88 (9th Cir. 1993).   "Absent a showing of fundamental

unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas

relief."   *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994).

Petitioner goes into great detail explaining why the trial court's sentencing was erroneous

under state law.   The California Court of Appeal considered and rejected these arguments on

appeal.   With regard to the first argument, that the court failed to offer reasons for consecutive

sentences, the court explained that the court's rationale could be deciphered from context:

> Although the trial court did not explicitly state that it was imposing consecutive
> terms because "[t]he crimes were committed at different times or separate places"
> (rule 4.425(a)(3)), the court did state that in determining defendant's sentence, it
> "broke down the counts ... by incident." Taken in context, the court's statement
> appears to be an explanation of why it chose to impose consecutive terms for
> seven of the lewd act counts—i.e., because defendant committed those lewd acts
> at different times.

*Garcia*, 2014 WL 3752799, at *10.

Next, the court rejected petitioner's second argument that the trial court relied on the

victim's age as a sentencing factor, noting that the trial court "explicitly acknowledged that it

could not use Doe's age as a sentencing factor because 'that is an aspect of the charges.' " *Id.* at

*11.   With regard to petitioner's third argument, it determined that "[t]o the extent the trial court's

sentencing decisions were influenced by its views on the consequences of similar criminal conduct

in other cases, we find no error" and that the court properly considered the individual

circumstances of the case in rendering its sentence.   *Id.* at *12.   The court rejected petitioner's

fourth argument, that the court failed to consider mitigating factors, explaining that "[t]he record

indicates that the trial court imposed consecutive sentences based on one of the enumerated

criteria: '[t]he crimes were committed at different times or separate places.' (Rule 4.425(a)(3).)

The trial court was not required to consider any factors in mitigation. (Rule 4.425(b).)." *Id.*

Finally, the court rejected petitioner's fifth argument, that the court erroneously imposed the

middle term, concluding that the trial court must be afforded significant discretion in weighing the

various mitigating and aggravating factors and that the court's imposition of the middle term was

1  not arbitrary. *Id.* at *13.

2    As the Court of Appeal concluded, none of petitioner's sentencing claims evidences a

3  clear, if any, error on the part of the trial court.  These alleged errors are not sufficient to justify

4  granting habeas relief.  Petitioner has not identified any sentencing errors that rise to the level of

5  fundamental unfairness.  Petitioner's Claim 4 for federal habeas relief is DENIED.

6  **V.  CLAIM 5: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IS FAILING TO OBJECT TO SENTENCING ERRORS**

7    Petitioner contends that his trial counsel was ineffective by failing to object to the alleged

8  sentencing errors described in Claim 4.  Pet. 24.  Because, as the Court of Appeal concluded, the

9  trial court did not make any sentencing errors, petitioner's ineffective assistance claim must fail.

10  It is both reasonable and not prejudicial for defense counsel to forgo a meritless objection.  *See*

11  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).  As petitioner has failed to show any

12  sentencing errors, his counsel could not have acted unreasonably in failing to object to the

13  sentencing proceedings.  Petitioner's Claim 5 is DENIED.

14  **VI.  CLAIM 6: TRIAL COURT ERRONEOUSLY PERMITTED THE PROSECUTOR TO ASK QUESTIONS BEYOND THE SCOPE OF THE DIRECT EXAMINATION**

15    Petitioner argues that the prosecutor's questions to petitioner on cross-examination went

16  beyond the scope of the direct examination and violated his Fifth Amendment right against self-

17  incrimination.  Pet. 29.  The Fifth Amendment provides that "[n]o person… shall be compelled in

18  any criminal case to be a witness against himself."  U.S. CONST. AMEND. V.  However, that right is

19  not absolute: "[a] defendant who testifies in his own behalf waives his privilege against self-

20  incrimination with respect to the relevant matters covered by his direct testimony and subjects

21  himself to cross-examination by the government."  *United States v. Hearst*, 563 F.3d 1331, 1339

22  (1977) (citing *Brown v. United States*, 356 U.S. 148 154-55 (1958)).

23    The Supreme Court has held that when a defendant testifies, his credibility is subject to

24  impeachment and his testimony is to be treated like any other witness, and "the breadth of his

25  waiver is determined by the scope of relevant cross-examination."  *Hearst*, 563 at 1340.  The

26  Court has long held that "a defendant who takes the stand in his own behalf cannot then claim the

27  privilege against cross-examination on matters reasonably related to the subject matter of his

1  direct examination." *McGautha v. California*, 402 U.S. 183, 215 (1971).  That a defendant faces

2  such a dilemma demanding a choice between complete silence and presenting a defense has never

3  been thought an invasion of the privilege against self-compelled incrimination.  *See Williams v.*

4  *Florida*, 399 U.S. 78, 83-84 (1970).

5          Petitioner raised this same claim on direct appeal to the state appellate court which denied

6  his claim:

> Defendant contends the trial court should have sustained the
> objections he made below and barred the prosecution from asking
> him specific questions about his sexual activities with Doe.
> Defendant contends that on direct examination, he never "testifie[d]
> to the circumstances of the charged offenses" (Mayfield, supra, 14
> Cal.4th at p. 754) and thus he did not "invite the prosecutor's cross-
> examination regarding specifics of the alleged crimes." He claims
> the improper cross-examination was prejudicial because Doe's
> testimony was "confusing and conflicting," and thus his testimony
> served to "bolster" the prosecution's case.
>
> Although defendant did not directly deny committing the charged
> offenses on direct examination, the record indicates he testified in
> order to persuade the jury that he should not be found guilty because
> he was involved in a consensual relationship with Doe. Despite his
> attempt to limit the scope of cross-examination by offering only
> vague and abbreviated testimony about the relationship, the
> prosecution was entitled to explore the topic in greater detail. (See
> Mayfield, supra, 14 Cal.4th at p. 754; Lynn, supra, 16 Cal.App.3d at
> p. 272.) For instance, after defendant admitted, on direct
> examination, that he continued to see Doe after knowing that she
> was 12 years old, the prosecutor was permitted to ask whether
> defendant found out Doe was 12 years old before or after he had
> sexual intercourse with her. The prosecutor could also ask defendant
> how many times he had sexual intercourse with Doe after finding
> out that she was 12 years old. Also, since the import of defendant's
> testimony was that his conduct was not criminal, the prosecutor was
> permitted to ask him whether he thought it was "okay" when he was
> having sexual intercourse with Doe.
>
> In sum, the trial court did not abuse its discretion by overruling
> defendant's objections when he asserted that the prosecutor was
> cross-examining him about matters that went beyond the scope of
> his direct examination.

*Garcia*, 2014 WL 3752799, at *7.

          The state court reasonably determined that the prosecutor did not exceed the scope of

direct examination.  Because petitioner testified on direct examination about his relationship with

Doe, the prosecutor was entitled to question petitioner on this subject on cross-examination.  The

Court of Appeal's determination that the prosecutor's questioning did not violate petitioner's right against self-incrimination was not an objectively unreasonable application of clearly established federal authority and is entitled to AEDPA deference.  Petitioner's Claim 6 is DENIED.

## VII.   INSUFFICIENT EVIDENCE

Petitioner argues that the evidence presented at trial was insufficient to convict him for contacting or communicating with a minor with the intent to commit a sex offense, Cal. Penal Code § 288.3(a).  Pet. at 32-36.  The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A petitioner "is entitled to habeas corpus relief if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  A challenge to the sufficiency of evidence "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Id.* at 324 n. 16; *see also Emery v. Clark*, 643 F.3d 1210, 1214 (9th Cir. 2011) ("Insufficient evidence claims are reviewed by looking at the elements of the offense under state law.").

Petitioner asserts that there is insufficient evidence of the first element of section 288.3(a) because he did not "actively contact[] or communicate[] with Jane Doe…."  Pet. 35.  Petitioner was convicted under Cal. Penal Code section 228.3 which provides:

> (a) Every person who contacts or communicates with a minor, or attempts to contact or communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit an offense specified in Section 207, 209, 261, 264.1, 273a, 286, 288, 288a, 288.2, 289, 311.1, 311.2, 311.4 or 311.11 involving the minor shall be punished by imprisonment in the state prison for the term prescribed for an attempt to commit the intended offense.

> (b) As used in this section, "contacts or communicates with" shall include direct and indirect contact or communication that may be achieved personally or by use of an agent or agency, any print medium, any postal service, a common carrier or communication common carrier, any electronic communications system, or any telecommunications, wire, computer, or radio communications device or system.

> (c) A person convicted of a violation of subdivision (a) who has previously been convicted of a violation of subdivision (a) shall be punished by an additional and consecutive term of imprisonment in

24

the state prison for five years.

Section 228.3 was enacted following the passing of Proposition 83, which was intended to protect children from sex offenders.  2006 Cal. Legis. Serv. Prop. 83; Pet. 35.  Petitioner asserts that Proposition 83 "was not intended to criminalize the communication that petitioner had with Jane Doe" because "the first element of 288.3 should require that the defendant initiate communication or contact with a minor."  Pet. 35.  Petitioner raised this same argument in the state appellate court, which rejected his interpretation of section 288.3:

> We first address defendant's contention that there was insufficient evidence that he "initiate[d] communication" with Doe. Defendant acknowledges that nothing in section 288.3 explicitly requires that the defendant initiate communication with a minor, but he argues that such a requirement should be read into the statute "[b]ased on the stated purposes of the passage of Proposition 83."
>
> " 'In interpreting a voter initiative . . . , we apply the same principles that govern statutory construction. [Citation.] Thus, [1] "we turn first to the language of the statute, giving the words their ordinary meaning." [Citation.] [2] The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme [in light of the electorate's intent]. [Citation.] [3] When the language is ambiguous, "we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' [Citation.]" (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900–901.)
>
> Thus, we begin by examining the plain language of the statute, which criminalizes "contact[ ] or communicat[ion] with a minor" when such contact or communication is done with the intent to commit a specified sex offense involving that minor. (§ 288.3, subd. (a).) Although the word "contact" can mean "to make contact" (see Merriam–Webster's Collegiate Dict. (10th ed. 1999) p. 249), it also means to "be in contact with" (*ibid.*). Moreover, the statute also applies to a person who "communicates" with a minor with the intent to commit a specified sex offense (§ 288.3, subd. (a)). The word "communicate" means "to convey knowledge of or information about : make known." (Merriam–Webster's Collegiate Dict. (10th ed. 1999) p. 232.) A person can "communicate[ ]" with a minor without initiating the communication. (§ 288.3, subd. (a).)
>
> Moreover, the phrase "contacts or communicates with" (§ 288.3, subd. (a)) is explicitly defined in the statute, which does not specify that the perpetrator must initiate the contact or communication. Section 288.3, subdivision (b) states that " 'contacts or communicates with' shall include direct and indirect contact or communication that may be achieved personally or by use of an agent or agency, any print medium, any postal service, a common carrier or communication common carrier, any electronic communications system, or any telecommunications, wire,

computer, or radio communications device or system." Nothing in the foregoing definition indicates that the electorate intended the phrase "contacts or communicates with" to mean that the perpetrator must initiate the contact or communication.

Even if we were to find the plain language of the statute ambiguous, nothing in the stated intent of the electorate suggests that section 288.3 was intended to apply only where the perpetrator initiates communication with a minor. The summary of Proposition 83 provided to voters specified that "the common purpose of the provisions of Proposition 83 [was] to protect Californians from the threat posed by sex offenders." (*People v. Keister* (2011) 198 Cal.App.4th 442, 451 (*Keister* ).) "[T]he provisions of Proposition 83 were summarized for voters as follows: (1) 'Increases penalties for violent and habitual sex offenders and child molesters'; (2) 'Prohibits registered sex offenders from residing within 2,000 feet of any school or park'; (3) 'Requires lifetime Global Positioning System monitoring of felony registered sex offenders'; (4) 'Expands definition of a sexually violent predator'; and (5) 'Changes current two-year involuntary civil commitment for a sexually violent predator ... and subsequent ability of sexually violent predator to petition court for sexually violent predator's conditional release or unconditional discharge.' (Voter Information Pamp., Gen. Elec. (Nov. 7, 2006) official title and summary of Prop. 83, p. 42.)" (*Ibid.*)

Defendant appears to be arguing that since the intent of the electorate was to "protect Californians from the threat posed by sex offenders" (*Keister, supra,* 198 Cal.App.4th at p. 451), the electorate must have intended section 288.3 to apply only to sex offenders who initiate contact or communication with a minor. We disagree. Section 288.3 bars a person from contacting or communicating with a minor with the intent to commit a sex offense on that particular minor. The focus of the statute is the specific intent behind the contact or communication, not how the contact or communication begins. Thus, we effectuate the electorate's intent to protect Californians from sex offenders by interpreting the statute to apply to all contact or communication with a minor that is accompanied by the intent to commit a sex offense on the minor. It was not necessary for the prosecution to prove that defendant initiated the contact or communication with Doe, only that he had the intent to commit a sex offense on Doe when he contacted or communicated with her.

*Garcia*, 2014 WL 3752799, at *4–5.

The California Court of Appeal rejected petitioner's interpretation of the statute, concluding that neither the language of the statute or the purpose behind it, protecting children from sex offenders, supports reading in petitioner's limitation that it applies only where a defendant "initiated contact." I defer to the California court's interpretation of California law and conclude that Section 288.3 does not require showing that a defendant "initiated contact."

Under a plain reading of Section 288.3, there was ample evidence introduced in trial

United States District Court
Northern District of California

26

showing that petitioner communicated with Doe with the intent to commit lewd or lascivious acts:

> We next address defendant's contention that there was insufficient evidence that he had "the intent to commit lewd or lascivious acts at the time of the communication." Defendant asserts there was no evidence regarding the content of his communications with Doe and thus no direct evidence of his intent. He acknowledges that he and Doe always communicated before meeting up, but he points out that they did not always have sexual intercourse. Thus, defendant claims, it was not reasonable to infer that he intended to commit a lewd act at the time of those communications.

> Doe testified that she and defendant would always communicate before getting together. They exchanged text messages before the incident in the middle of December of 2011, when they held hands and kissed. They made arrangements to meet via text messages prior to the incident before Christmas of 2011, when they kissed in a car. They communicated by telephone call before the incident after Christmas of 2011, when they kissed and had sexual intercourse in a car. They always communicated by telephone before defendant came over to her house. Although they did not always engage in sexual intercourse when he came over, they always kissed. Thus, it was reasonable to infer that defendant intended to engage in lewd acts with Doe when he communicated with her prior to coming over.

> Because it was unnecessary for the prosecution to prove that defendant initiated communication with Doe and because a reasonable trier of fact could find that defendant intended to engage in lewd acts with Doe at the time of the communications, substantial evidence supports defendant's convictions of contacting or communicating with a minor with the intent to commit lewd acts (§ 288.3, subd. (a)), as charged in counts 4, 6, 8, 11, 14, and 17. (See *Johnson, supra,* 26 Cal.3d at p. 578.)

*Garcia*, 2014 WL 3752799, at *5–6.

There was substantial evidence to support the Section 288.3 violations.  The California Court of Appeal's denial of this claim was not objectively unreasonable and therefore is entitled to AEDPA deference.  Petitioner's Claim 7 is DENIED.

## VIII.   CUMULATIVE ERRORS

Petitioner finally argues that the cumulative effect of errors at trial resulted in a denial of due process and thus warrants habeas relief.  Pet. 36-37.  In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may prejudice a defendant to the extent that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple

27

constitutional errors hindered defendant's efforts to challenge every important element of proof

offered by prosecution); *Thomas v. Hubbard*, 273 1164, 1179-81 (9th Cir. 2002), *overruled on*

*other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (reversing

conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement

providing only evidence that defendant had motive and access to murder weapon; (b) prosecutorial

misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm;

and (c) truncation of the defense's cross-examination of a police officer, which prevented defense

from adducing evidence that someone else may have committed the crime and evidence casting

doubt on credibility of main prosecution witness).  "The cumulative effect of multiple errors can

violate due process even where no single error rises to the level of a constitutional violation or

would independently warrant reversal." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011)

(internal quotation marks and citation omitted).  Habeas relief may be warranted "under the

cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such

that they amplify each other in relation to a key contested issue in the case." *Id.* (internal

quotation marks and citation omitted).

Petitioner asserts a cumulative prejudicial effect because: (i) the trial court erroneously

permitted the prosecutor to ask improper questions regarding the circumstances of the offenses;

(ii) the prosecutor committed misconduct when he discussed Doe's virginity in closing arguments

and trial counsel was ineffective in failing to object to this alleged misconduct; and (iii) the trial

court erred during sentencing and trial counsel was ineffective in failing to object to the sentencing

error. Pet. 37.

Petitioner raised this same cumulative claim on appeal.  The Court of Appeal concluded

that there was no cumulative prejudicial effect:

> We have concluded that the trial court did not err by overruling
> defendant's objections when he asserted that the prosecutor was
> cross-examining defendant about matters that went beyond the
> scope of his direct examination, and that any prosecutorial
> misconduct was not prejudicial. As we have not found multiple trial
> errors, there is no cumulative prejudice.

*Garcia*, 2014 WL 3752799, at *9.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The state's decision was objectively reasonable.  As discussed above, petitioner has not

2  identified a sentencing error and the trial court did not err by overruling petitioner's objections

3  regarding the scope of cross-examination.  Although it is possible that the prosecution erred by

4  highlighting Doe's virginity, this alleged error did not render the trial fundamentally unfair.

5  Petitioner has failed to establish multiple errors that could "amplify each other in relation to a key

6  contested issue in the case."  *Ybarra*, 656 F.3d at 1001 (internal quotation marks and citation

7  omitted).  The state court's denial of the claim was not objectively unreasonable and therefore is

8  entitled to AEDPA deference.  Petitioner's Claim 8 is DENIED.

9                                              **CONCLUSION**

10    Petitioner's Claims (2)-(8) are DENIED.  Petitioner's request for an evidentiary hearing is

11  GRANTED with regards to Claim (1).

12    The Court will hold a status conference on Tuesday, March 14, 2017 at 2:00 p.m. to

13  discuss the timing of the evidentiary hearing and other matters pertinent to this case.  The parties

14  shall file a Joint Status Conference Statement by March 9, 2017 to propose a date for the hearing

15  and any other matters that they wish to bring to the Court's attention.  By separate order, James S.

16  Thomson is appointed as counsel for petitioner for purposes of the evidentiary hearing and any

17  post-hearing briefing that may be necessary.  18 U.S.C. § 3006(A)(a)(2)(B).  Mr. Thomson shall

18  submit such budgets as appropriate for CJA approval.

19    **IT IS SO ORDERED**.

20  Dated: March 1, 2017



WILLIAM H. ORRICK
United States District Judge